74357. NORTHWEST PREFERRED, LTD. et al. v. WILLIAMS.
(360 SE2d 910)

BEASLEY, Judge.

Irvie Williams sued Northwest Preferred, Ltd., BMS Enterprises, Inc., and Edwin Jackson, the president of both corporations, alleging he was entitled to a $15,000 commission for arranging financing for a project known as Lake Lanier Cottages.

Northwest encountered difficulty in obtaining financing for 55 cottages located at Lake Lanier because the property was leased from the Corps of Engineers rather than held in fee simple. Jackson therefore contacted Gordon Cahoon regarding this matter and Cahoon in turn sought the assistance of Williams with whom he frequently "co-oped" ventures of this type. They agreed to work on this project and share "fifty fifty." Williams contacted Andrew Mortgage Company, a broker and underwriter, who in the course of its business assessed and processed mortgage applications and either made the loan or obtained

a suitable lender to fund the project. It agreed to provide financing and then arranged lending through Goldome Mortgage which forwarded a commitment letter for $2,912,000 dated February 28, 1983, to Andrews. This was accepted by Copeland, the president of Andrews. Goldome ultimately agreed to provide a total of $2,900,000 to Northwest via two commitment letters dated April 29, 1983.

Meanwhile, on March 16, Northwest executed an agreement with Williams and Cahoon which stated that they had earned a commission of $15,000 each for services in arranging the financing for the 55 cottages. The agreement further provided that, upon Northwest's funding of any of the final 1.2 million dollars of the 2.9 million commitment, Williams and Cahoon would be immediately entitled to their commissions.

Although Jackson expressed satisfaction with their services, when Williams and Cahoon requested their commission, Jackson asked for additional time. The present lawsuit resulted from a complete failure to pay Williams' commission.

1. Defendants contend that Williams did not earn a commission because the final terms of the commitment varied substantially from those which Williams obtained. Their view is that they received no benefit from his arrangement but had to negotiate a new agreement with Goldome by which the mortgage money was eventually obtained.

The commitment letter from Goldome to Andrews referencing Northwest contained virtually the same terms and conditions as the final two commitment letters of April 29. The only substantial difference is that the original commitment referred to the cottages as being held in fee simple. However, the jury was authorized to find that this was at worst a scrivener's error since all the parties were aware that the status of the land being leased' was the problem in securing financing. The agreement of March 16 accurately reflected the fact that as of that time Williams had performed a valuable service in obtaining a lender for Northwest and the Lake Lanier project. The jury's verdict was authorized by the evidence.

2. Defendant BMS and Jackson contend that because the agreement to pay a commission was by Northwest and they are separate legal entities they were entitled to directed verdicts in their favor.

The mortgage money was not actually utilized by Northwest but instead went to BMS, which was set up as the holding corporation for the sales of Lanier Island Cottages. The loan commitments provided that they could be assigned to an affiliate of Northwest, which BMS was. BMS' prospectus states repeatedly that it is intended that BMS be the purchaser of the property (leasehold interest) and that Northwest, its "affiliate," was to manage and operate rental of the cottages. The commitment was in fact used for BMS to purchase the property, and the loan was closed in the name of BMS. The two corporations

were acting in concert to achieve the aims of the project. Because BMS received the benefits of the funding it must bear its share of the financial burdens under the theory of quantum meruit.

As to Jackson the evidence shows that he acted only in his capacity as president of the two corporations and did not hold himself out in an individual capacity.

In the recent case of *Earnest v. Merck*, 183 Ga. App. 271, 273 (358 SE2d 661), this Court held: "The mere operation of corporate business does not render one personally liable for corporate acts. *Trans-State v. Barber*, 170 Ga. App. 372, 374 (317 SE2d 242). The corporate veil may be pierced where the parties themselves have disregarded the separateness of legal entities by commingling on an interchangeable or joint basis or confusing the otherwise separate properties, records or control. We have not been presented with nor found any evidence in this record to indicate that Merck, in addition to acting as the principal operating officer of the corporate bodies involved, also conducted his private and corporate business on an interchangeable or joint basis as if they were one."

Here as in that case Jackson signed all the documents in his representative capacity. Williams did not deal with him as an individual and Jackson did not commingle his individual and corporate business or otherwise conduct his private business as opposed to his corporate transactions on an interchangeable or joint basis. It was therefore error to deny his motion for directed verdict.

3. The ruling on directed verdict renders moot any issue as to the trial court's failure to properly differentiate between the parties defendant in the instructions to the jury.

4. The remaining enumeration of error regarding the jury charge is without merit.

*Judgment affirmed in part and reversed in part. McMurray, P. J., concurs. Sognier, J., concurs specially.*

SOGNIER, Judge, concurring specially.

I concur specially in Division 2 of this opinion. Quantum meruit involves an implied promise to pay the reasonable value of services rendered by one party when those services are accepted by a second party. OCGA § 9-2-7. There is no evidence in this case that Williams knew of the existence of BMS when he rendered his services on behalf of Northwest Preferred or that Williams knew of BMS' connection with the benefits resulting from the performance of his services. Nor is there any evidence that the acceptance by BMS of the benefits of Williams' services was intended to be or constituted in fact a ratification of Williams' acts. The majority's opinion seems to indicate that the mere receipt by BMS of the benefits of Williams' services, without more, is sufficient to hold BMS liable for the reasonable value of

those services. However, the courts of this State have recognized that "[w]here one without knowledge neither authorizes, consents to, nor ratifies another's labor . . ., there is no duty imposed upon the one so benefited to make restitution. The reason is that in the absence of knowledge or authorization it would be unduly harsh to require the recipient's return of the value of . . . services when the . . . services cannot themselves be returned. [Cits.]" *Beavers v. Weatherly*, 250 Ga. 546, 548 (299 SE2d 730) (1983).

I concur specially, however, because we are bound on appeal to construe the evidence with every inference and presumption being in favor of upholding the jury's verdict. *American Game &c. Svc. v. Knighton*, 178 Ga. App. 745 (1) (344 SE2d 717) (1986). Thus, I find that the evidence showing Jackson to be the executive officer in both Northwest Preferred and BMS sufficient to support the inference that Jackson's knowledge regarding Northwest Preferred's authorization of Williams' services was acquired in connection with BMS' business and therefore was imputable to BMS. See generally *Crosby v. Savannah Elec. &c. Co.*, 114 Ga. App. 193, 206 (150 SE2d 563) (1966); see also *Archibald Hardware Co. v. Gifford*, 44 Ga. App. 837, 838 (3) (163 SE 254) (1932). BMS was thereby rendered liable for the reasonable value of Williams' services and, accordingly, the judgment on the jury verdict in regard to BMS must be affirmed.

DECIDED SEPTEMBER 10, 1987.

*Fred L. Cavalli*, for appellants.
*Ronald A. Lowry*, for appellee.